IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-05-00339-CV

 

Theron Belton,

                                                                      Appellant

 v.

 

Conagra Poultry Co.,

                                                                      Appellee

 

 

 



From the 278th District Court

Madison County, Texas

Trial Court No. 01-9649-278-10

 



ORDER denying rehearing



 

          Appellant has filed a motion for
reconsideration, which we will treat as a motion for rehearing.  We have
received correspondence from the trial court stating that the summary judgment
that is the basis for this interlocutory appeal has been set aside.

Appellant’s motion for reconsideration is denied.

PER CURIAM

 

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

Motion
denied

Order
issued and filed January 11, 2006

          (Chief
Justice Gray would, based on the prior ruling of the majority, simply deny the
motion without further commenting on the communication from the trial court
which does not appear to have been copied on the parties.)








 






ion1;}
-->












 

IN
THE

TENTH
COURT OF APPEALS

_______________

                       

No. 10-04-00083-CR

No. 10-04-00084-CR

 

EX PARTE TREY LOGAN DAVIS

EX PARTE CHAD FENLEY DAVIS

_____________________

                           

From the 272nd District Court

Brazos County, Texas

Trial Court Nos. 04-000338-CV-272 and 04-000339-CV-272

 



O p i n i o n



 

            The State charged Trey and Chad Davis with
murder.  A magistrate set bail for each
at $1,000,000.  Trey and Chad filed habeas applications seeking a reduction
of bail, which the trial court denied. 
They contend on appeal that the court abused its discretion because: (1)
they cannot afford to make bail in this amount; (2) they have ties to the
community which indicate that they do not pose a flight risk; (3) adequate
conditions of bail could be imposed to ensure that they pose no threat to the
community; and (4) the circumstances of the offense simply do not justify bail
in this amount.

          Because most of the evidence supports a reduction of bail
as to Trey, we will reverse the judgment as to Trey and reduce his bail to
$500,000.  Because the evidence is less
favorable as to Chad but his bail is excessive when compared to
other cases involving similar factual scenarios, we will reverse the judgment
as to Chad and reduce his bail to $750,000.

STANDARD
OF REVIEW

We
review a court’s pretrial bail determination under an abuse-of-discretion
standard.  Ex parte Rubac, 611 S.W.2d 848, 850 (Tex. Crim. App. [Panel Op.]
1981); Ex parte Beard, 92 S.W.3d 566,
568 (Tex. App.—Austin 2002, pet. ref’d); Ex
parte McCullough, 993 S.W.2d 836, 837 (Tex. App.—Waco 1999, no pet.).  A habeas applicant bears the burden of
proving that his bail is excessive.  Rubac, 611 S.W.2d at 849; Beard, 92 S.W.3d at 568; McCullough, 993 S.W.2d at 837.

Article
17.15 provides five factors to be considered in determining what bail is
appropriate:

          1.       The
bail shall be sufficiently high to give reasonable assurance that the
undertaking will be complied with.  

 

          2.       The
power to require bail is not to be so used as to make it an instrument of
oppression.

  

          3.       The
nature of the offense and the circumstances under which it was committed are to
be considered.  

 

          4.       The
ability to make bail is to be regarded, and proof may be taken upon this point.  

 

          5.       The
future safety of a victim of the alleged offense and the community shall be
considered.

 

Tex. Code Crim. Proc. Ann. art. 17.15 (Vernon Supp. 2004).

Other
pertinent factors include family and community ties, work history, length of
residence in the county, prior criminal record, conformity with conditions of
prior bonds, and any aggravating circumstances of the offense.  Rubac,
611 S.W.2d at 849-50; Beard, 92
S.W.3d at 568; McCullough, 993 S.W.2d
at 837.  Although a defendant’s ability
to make bail is a factor for consideration, inability to make bail, even to the
point of indigence, does not control over the other factors.  Ex
parte Charlesworth, 600 S.W.2d 316, 317 (Tex. Crim. App. [Panel Op.] 1980);
McCullough, 993 S.W.2d at 837.

We will
review the court’s decision in light of the pertinent factors.

Sufficiently High to Give Reasonable Assurance of
Appearance

          “[B]ail should be set high enough to give reasonable
assurance that the defendant will appear at trial.”  McCullough,
993 S.W.2d at 837 (quoting Ex parte Brown,
959 S.W.2d 369, 371 (Tex. App.—Fort Worth 1998, no pet.)).  A defendant’s ties to the community and work
history bear on the adequacy of bail to give reasonable assurance he will
appear.  See McCullough, 993 S.W.2d at 837-38.  A defendant’s compliance with the conditions
of any prior bonds likewise bears on this issue.

          Here, Trey testified in his own behalf that he lives with
his father Willie in Brazos
 County.  He has
lived there for ten years.  He works with
Willie in the oilfield business, although at the time of the hearing he was
unable to work because of a broken arm. 
Trey had complied with the conditions of a prior appearance bond related
to a charge of unlawfully carrying a weapon.

          Conversely, Trey’s brother Chad did not testify.  Nor did he present evidence of his ties to
the community or employment situation. 
Nevertheless, the State presented evidence that Chad has a residence in Point Blank, San Jacinto County, near Lake Livingston.[1]  According to the affidavit presented to
obtain a search warrant for Chad’s residence, this property was “in charge of
and controlled by” Trey, Chad, Willie, and others unknown.

          The State also presented evidence that Trey and Willie have
an occupation other than (or in addition to) the oilfield business and that Chad is engaged in this other pursuit as well.  A Texas Ranger testified that he received
information from a confidential informant that Trey, Chad, and Willie are personally engaged in
trafficking marihuana and cocaine from Mexico to Georgia and elsewhere. 
This information is corroborated by evidence seized during the search of
Chad’s home, Willie’s and Trey’s home, and a tour
bus owned by Willie.  In these searches,
authorities recovered miscellaneous firearms and ammunition, marihuana, drug
paraphernalia, more than $26,000 in cash, numerous cell phones and pagers, cell
phone parts, numerous vehicles, and out-of-state license plates.

The
information provided by the informant is also corroborated by the circumstances
of the offense.  According to the
allegations, the murder victim Tommy Andrade had “ripped off the [Davises] for $100,000 worth of drugs and/or money.”

          Trey’s ten-year residence in Brazos County, his work in the
oilfield business, and his compliance with the conditions of his prior bond all
lead to the conclusion that a significantly high bail would not be necessary to
ensure his appearance at trial. 
Conversely, his alleged involvement in narcotics trafficking across
state and national boundaries and perhaps his access to a residence in another
county lead to the opposite conclusion.

          Chad on the other hand presented no evidence with
regard to this factor which would suggest that a lesser bond would
suffice.  The evidence on this factor as
to Chad all points to the need for a fairly high bail
to ensure his appearance.

Not
So High as to Constitute an Instrument of Oppression

        Bail set in a particular amount becomes
“oppressive” when it is “based on the ‘assumption that [the accused cannot]
afford bail in that amount and for the express purpose of forcing [the accused]
to remain incarcerated pending [trial].’” 
McCullough, 993 S.W.2d at 837 (quoting Ex parte Harris,
733 S.W.2d 712, 714 (Tex. App.–Austin 1987, no pet.)).  The record contains nothing to indicate that
the trial court rendered its decision on this basis.  Cf. Harris, 733 S.W.2d at 714 (trial
judge stated, “I’d rather see him in jail than to see someone’s life taken . .
. .”).

Nature and Circumstances of
the Offense

          Trey and Chad are both charged with murder, which carries a
potential maximum sentence of life imprisonment and a fine of up to
$10,000.  See Tex. Pen. Code Ann. §§ 12.32, 19.02(c)
(Vernon 2003).

As
previously indicated, the allegations are that this was a drug-related
killing.  The State presented evidence
that Chad hired three men from Georgia “to beat Andrade up and let him know that it
came from Chad Davis because Andrade had ripped off the [Davises] for $100,000 worth of drugs and/or
money.”  The hired assailants lived in
Willie’s tour bus which was parked in his driveway during their stay.  Trey and Chad provided them marihuana during their stay, gave
them firearms for their confrontation with Andrade, and showed them where
Andrade lived.  The Davises also provided them an “older model” four-door
car for transportation.

The
assailants got into a gun battle with Andrade when they confronted him.  Two of the assailants received gunshot wounds
before they fatally shot Andrade.  They
called Chad for assistance on a cell phone provided by the Davises.  Trey
and Chad came to help soon thereafter in Trey’s
sport-utility vehicle.  Trey drove the
assailants’ car away.  Chad drove them to a motel “where they tried to
clean up and calm down.”  Trey later
joined them.  Chad and he tried to bandage their wounds and gave
them pain medication.  Willie later
transported them back to Georgia in the tour bus and provided them motel rooms in
Atlanta where they were treated by a nurse.

This
evidence could lead to a conclusion that Chad was the primary instigator of the whole
transaction.  According to the search
warrant affidavit from which most of this information is derived, Chad hired the assailants and met them at the Houston airport. 
Chad wanted them to let Andrade know that the
beating they were to inflict “came from Chad Davis.”  And although the Chad hired the assailants only “to beat Andrade up,”
the fact that Trey and Chad furnished them with firearms could lead to the
conclusion that Trey and Chad knew the encounter could turn more violent or
even that they intended for it to escalate. 
In sum, the State presented evidence that Chad and perhaps Trey hired three “hitmen” from Georgia to assault Andrade because of a $100,000 drug
debt.

To
whatever degree Trey has less complicity in the murder, the evidence nevertheless
supports a conclusion that he knowingly participated in the events leading up
to the murder and knowingly assisted the assailants as they fled the state.

Trey
and Chad contend that their level of involvement in the
offense suggests that a lesser bail is appropriate because they hired the
assailants only to “beat up” Andrade and because they did not participate in
the shooting.  We agree that this is a
consideration.

Nevertheless,
the evidence surrounding this drug-related killing suggests the need for a
fairly high bail to ensure both Trey’s and Chad’s appearance. 
However, the evidence also suggests that a higher bail may be more
appropriate for Chad than for Trey due to their respective levels of
involvement in the entire transaction.

Ability
to Make Bail

A
bondsman testified that he charges a fee of ten percent of the amount of bail
to make a bond.  He met with Willie, and
they determined that the Davis
family could raise enough money to cover $300,000 in bail ($150,000 apiece).

Trey
testified that $11,800 was seized from him when he was arrested and that he has
$11,000 in the bank.  These are his only
resources.[2]  On cross-examination, the State inquired
about Trey’s work income before his injury and about other resources.  Trey testified that he earned between $200
and $400 per month on average and that he had received a $42,000 settlement
from an insurance company about ten months before the bail hearing for injuries
sustained in a collision.  The $11,000
balance of his bank account is all that remains of the settlement, and he was
unable to provide much detail regarding how he spent the other $31,000. 

Chad presented no additional evidence regarding his
own financial circumstances beyond the testimony of the bondsman.  However, the papers included with the search
warrant for Chad’s residence reflect that the value of this
property is $127,550 and that the property is held in the name of Shanna
Hawkins c/o W. E. Davis.[3]

Trey
and Chad contend that their ability to each afford only
$150,000 in bail is undisputed.  The
State counters that consideration should be given to the value of Chad’s residence and the property seized from his
home, the $31,000 in funds which Trey spent, and the $100,000 “debt” owed them
by Andrade.  The State contends that such
consideration makes it “reasonable to assume that the Appellant indeed has
large financial resources [from] which he can possibly post bond.”

However,
the Court will not imply the existence of financial resources absent evidence
of their existence.  The property seized
from Chad is not presently available to him as a
resource.  Nor is the $31,000 which Trey
has already spent from his insurance settlement.  Perhaps Chad’s residence could be sold or encumbered to
raise money for bail, but the record reflects that title to this property is
held in another’s name.

Accordingly, we conclude that Trey presented largely
uncontroverted evidence that he could afford to make bail in an amount no
greater than $150,000.  Thus, the
evidence on this factor tends to support a reduction in the current bail as to
Trey.  Although Chad
is alleged to have “control” over the San Jacinto
 County residence, the evidence
reflects that title to that property is held by another.  Accordingly, the evidence on this factor
likewise tends to support a reduction of bail as to Chad.

Future Safety of the Community

          Trey does not address this factor in his brief.  Chad contends that the court can set reasonable
conditions such as electronic monitoring to ensure the safety of the community.

          The State counters that the circumstances of the offense
and the evidence regarding Trey’s and Chad’s involvement in narcotics trafficking suggest
that bail in a higher amount is necessary to ensure the safety of the
community.  See Maldonado v. State,
999 S.W.2d 91, 97 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d); Ex
parte Emery, 970 S.W.2d 144, 146 (Tex. App.—Waco 1998, no pet.).

          We agree with the State that the evidence pertinent to this
factor tends to support bail in a higher amount.

Prior Criminal History

          Trey has one prior misdemeanor conviction for disorderly
conduct, which was reduced from a charge of unlawfully carrying a weapon.

Chad received deferred adjudication community
supervision in 1994 for unlawfully carrying a weapon, felony community supervision
in March 1996 for possession of between four ounces and five pounds of
marihuana, and misdemeanor community supervision in May 1996 for possession of
less than twenty-eight grams of an unidentified controlled substance.  The trial court revoked Chad’s felony community supervision in March
2002.  Among the pertinent allegations in
the revocation motion were assertions that Chad left the State without the court’s permission[4]
and submitted a urine specimen not his own to pass the required urinalysis.

          Trey’s criminal history does not indicate the need for a
particularly high bail.  Chad’s on the
other hand suggests that a high bail is necessary, that he poses a flight risk,
and that he might disregard any conditions of bail imposed by the trial court.

Comparison to Bail in Other Cases

          The parties cite numerous cases published and unpublished which
they contend provide guidance here.  We
agree that comparison with other cases is appropriate.  See
Beard, 92 S.W.3d at 571; Emery,
970 S.W.2d at 145-46.  However, we will
limit our comparison to published[5]
decisions no more than five years’ old because these decisions are the most
relevant in terms of current economic indicators.[6]

          Trey cites Ex parte
Simpson as a relevant case in which bail was approved in the amount of
$600,000.  77 S.W.3d 894 (Tex. App.—Tyler 2002, no pet.).  In Simpson, the court approved this
amount for “a brutal, gang-related murder” where the defendant’s correspondence
indicated that he intended to renew his participation in the gang or flee if
released on bail.  Id. at 897. 
Trey contends that his bail should be lower than Simpson’s because
Simpson directly participated in the murder unlike Trey and because there is no
evidence in Trey’s case of an intent to flee or of gang membership.

          Trey, Chad and the State all cite In re Henson.  131 S.W.3d 645 (Tex. App.—Texarkana 2004, no pet.).  There, the defendant participated in a
“brutal triple homicide” committed during an after-hours robbery of a
restaurant.  Id. at 646. 
The trial court set bail at $750,000 for each of three counts.  The appellate court examined other cases and
balanced the severity of the crime with several more positive factors (the
defendant’s lack of a criminal record, the fact that he did not wield the
murder weapon, and his family and community ties).  After doing so, the court concluded that bail
of $500,000 for each count was more appropriate.  Id. at 648-51.

          Trey and Chad cite Henson for the proposition that
$1,000,000 is simply too high when compared to the $500,000 bail approved in
that case.  The State cites Henson
with reference to the cumulative total ($2,250,000 reduced to $1,500,000)
rather than the amount of bail set for each count.  We agree that Henson has some bearing on this case because there was no evidence
that the defendant in that case had a prior criminal record, the defendant did
not personally wield the murder weapon, and the defendant had “fairly strong”
community ties.  Id.

          Trey also cites Ex
parte Beard as a relevant decision. 
92 S.W.3d 566.  In Beard,
bail was set at $8,000,000 for a rather wealthy defendant charged with the capital
murder of her husband.  The appellate
court balanced the seriousness of the charge with the court’s conclusions that
(1) the defendant had a minor criminal history, (2)  did not pose a danger to the community, (3)
did not pose a flight risk, and (4) was unusually wealthy (as compared to “most
criminal defendants”).  After doing so,
the court held that the bail was too high and ordered it lowered to
$500,000.  Id., 92 S.W.3d at 572-74.

The State
cites two cases in which courts approved bonds of $3,000,000 and $2,500,000
respectively.  Ex parte Reyes, 4
S.W.3d 353, 356 (Tex. App.—Houston [1st Dist.] 1999, no pet.); Maldonado,
999 S.W.2d at 97.  However, these cases
involved defendants who were both arrested with 721 kilograms of cocaine.  Evidence was offered at the bail hearings in
these cases that this quantity of cocaine had a street value of between
$11,000,000 and $87,000,000, depending on how it was packaged and sold.  Reyes, 4 S.W.3d at 355 ($56,000,000 to
$87,000,000); Maldonado, 999 S.W.2d at 95 ($11,000,000 to $72,000,000).

          At best, Trey’s and Chad’s case involves a drug transaction worth
$100,000.  Although the State offered
evidence that Trey and Chad were engaged in trafficking “pure” cocaine from
Mexico, the State offered no evidence of the quantity
or value of the cocaine they are believed to be trafficking.  Thus, Reyes and Maldonado are
of little value for setting bail in Trey’s and Chad’s cases.

TREY’S BAIL

          Trey
presented evidence that he: (1) has lived in Brazos County for ten years; (2)
has a job in the oilfield business; (3) did not participate directly in
Andrade’s murder; (4) has inadequate financial resources to make bail of
$1,000,000; (4) has a relatively minor criminal history; and (5) has complied
with the terms of a prior appearance bond. 
This evidence tends to support a reduction of bail.

          Conversely,
the record contains evidence that Trey: (1) is engaged in narcotics
trafficking; (2) knowingly participated in Andrade’s murder; and (3) poses a
danger to the community because of his involvement in narcotics trafficking and
his participation in the murder.

          After
considering this evidence and comparing it to other bail cases, we hold that
the court abused its discretion by setting Trey’s bail at $1,000,000.  Cf.
Henson, 131 S.W.3d at 648-51; Simpson,
77 S.W.3d at 897.  We reverse the
judgment as to Trey and render judgment setting bail at $500,000.  See
Henson, 131 S.W.2d at 651.




CHAD’S BAIL

          Chad presented evidence that he did not participate
directly in Andrade’s murder and has inadequate financial resources to make
bail of $1,000,000.  Conversely, the
record contains evidence that he: (1) lives in another county; (2) may
disregard any conditions of an appearance bond as he did the conditions of
community supervision; (3) is engaged in narcotics trafficking; (4) knowingly
participated in Andrade’s murder; (5) poses a danger to the community because
of his involvement in narcotics trafficking and his participation in the
murder; and (6) has a prior criminal history.

After
considering this evidence and comparing it to other bail cases, we hold that
the evidence with regard to Chad supports a higher bail than for Trey.  Nevertheless, it appears that $1,000,000 is
too high when compared with other bail cases. 
Accordingly, we conclude that the court abused its discretion by setting
Chad’s bail at $1,000,000. 
Cf. Henson, 131 S.W.3d at
648-51; Simpson, 77 S.W.3d at 897.  We reverse the judgment as to Chad and render judgment setting bail at $750,000.

 

                                                                   FELIPE
REYNA

                                                                   Justice

Before Chief Justice Gray,

          Justice
Vance,

          Justice
Reyna

          (Chief
Justice Gray dissenting)

Reversed and rendered

Opinion delivered and filed August
 25, 2004

Publish

[CRPM]











[1]
             The State seems to suggest in its brief that Chad lived in some other residence near Lake Livingston. 
However, the testimony on which the State relies clearly indicates that
the residence in Point Blank is Chad’s residence and the record contains evidence of
no other real property owned by either Trey, Chad, or Willie.





[2]
             The bondsman was unsure whether Willie included Trey’s funds in
determining how much the family could raise to make bail.

 





[3]
             Willie Davis’s tour bus is also registered in the name of “W. E.
Davis.”





[4]
             Chad was arrested on the revocation warrant in Georgia.

 





[5]
             Although unpublished decisions may be cited, they have “no
precedential value.”  Tex. R. App. P. 47.7.  Because of this and because numerous
published decision are available for comparison, we will not include the
unpublished decisions in our analysis.

 





[6]
          Chad for example cites a 1985 decision among
others.  Perhaps the economic indicators
of that period were similar to those of the present, but the record contains no
evidence to substantiate this.  Absent
such evidence, we will confine our review to more recent decisions.  Cf. Ex
parte Henson, 131 S.W.3d 645, 648-49 (Tex. App.—Texarkana 2004, no pet.)
(declining to consider pre-1991 decisions cited by the appellant).